CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 02 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| JOHN H.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:20-cv-00076 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff John H. asks this Court to review the Commissioner of Social Security's final

decision denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–

434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having

considered the administrative record, the parties' filings, and the applicable law, I cannot find

that substantial evidence supports the decision to deny benefits. Accordingly, I respectfully

recommend that the decision be reversed and the case be remanded under the fourth sentence of

42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for the former Commissioner, Andrew M. Saul, as
the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v.

Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review

considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera

Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in

"any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*,

858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not

disabled. *See id.*

## II. Procedural History

John applied for DIB and SSI in May 2019, *see* Administrative Record ("R.") 54, 184–

90, ECF No. 9, alleging disability because of arthritis, high blood pressure, a torn bicep, a torn

rotator cuff, anxiety, and depression, R. 212. He alleged he became disabled on June 5, 2016, R.

184–85, although he still worked a few hours a week as a mechanic in May 2019, R. 212. John

was fifty-five years old, or a "person of advanced age" under the regulations, on his alleged onset

date. R. 70; 20 C.F.R. §§ 404.1563(e), 416.963(e). Disability Determination Services ("DDS"),

the state agency, denied both claims initially in August 2019, R. 54–86, and upon reconsideration

in January 2020, R. 90–130. In August 2020, John appeared with counsel and testified by

telephone at an administrative hearing before ALJ William Hauser. R. 27–53. A vocational

expert ("VE") also testified at this hearing. R. 44–51.

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

ALJ Hauser issued an unfavorable decision on September 8, 2020. R. 12–22. He found

that John had not engaged in substantial gainful activity since June 5, 2016, his alleged onset

date. R. 14. John had "severe" medically determinable impairments of "degenerative joint

disease of the right AC joint with right shoulder tendinopathy and obesity." R. 15. All other

medical conditions in the record, including carpal tunnel syndrome, were "not severe" because

they were "well controlled with medication and appropriate treatment" and "present[ed] no

evidence of residual abnormalities that ha[d] more than a minimal effect on [John's] ability to

perform basic work activities on a regular and continuing basis." *Id.* John's severe impairments

did not meet or medically equal any relevant Listing, in part because there was "not involvement

of one major peripheral joint in each upper extremity resulting in an inability to perform fine and

gross movements effectively, as defined in [§] 1.00B2c." *Id.* (citing 20 C.F.R. pt. 404, subpt. P,

app. 1 § 1.00(B)(2)(c)).

ALJ Hauser then evaluated John's residual functional capacity ("RFC") and determined

that he could perform "light"[4] work:

> except [he] is limited to lifting and/or carrying 25 pounds frequently with the left
> dominant upper extremity and 15 pounds occasionally and 25 pounds frequently
> with the right upper extremity and walking, standing, and sitting for six hours in an
> eight-hour workday. [He] must be able to take a ten-minute break every two hours.
> He can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps
> and stairs, balance, stoop, kneel, crouch, and crawl. He can never reach overhead
> with the right upper extremity and he is limited to lifting his right arm to shoulder

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "The full range of light work"
requires the ability to "stand or walk for up to six hours per workday or sit 'most of the time with some
pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582,
at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6
(Jan. 1, 1983). An RFC that allows the claimant to lift/carry more than 20 pounds, but fewer than 50
pounds, at one time falls between "light" and "medium" work. *See* 20 C.F.R. § 404.1567(c) ("Medium
work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects
weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do
sedentary and light work."); R. 46 ("[VE:] That RFC is really not medium, it's light. [ALJ:] Light?
Okay.").

height with lateral and straight range of motion. Due to pain, [he] must be able to
be off-task 7% of the time and miss nine days of work a year.

R. 16; *see also* R. 19–20. Based on the VE's testimony, ALJ Hauser concluded that John's

exertional limitations would not allow him to do his past "medium" to "heavy" work as a skilled

mechanic, R. 20, but that he could work as a Comparator Operator, which is a "light" semiskilled

occupation that offered a significant number (24,000) of jobs in the national economy, R. 21–22

(citing R. 45–51). Thus, ALJ Hauser concluded that John was "not disabled" from June 5, 2016,

through September 8, 2020. R. 22. The Appeals Council declined to review that decision, R. 1–7,

and this appeal followed.

### III. Discussion

John raises three challenges to the ALJ's decision. *See* Pl.'s Br. 1–2, 6–12. First, he

argues that ALJ Hauser erred by finding that he could work as a Comparator Operator and, as

such, the Commissioner did not carry her evidentiary burden to show he was "not disabled" at

step five. *See id.* at 1, 6–9 (discussing transferability of skills). Second, he argues that ALJ

Hauser failed to explain how he concluded John would be "off-task 7% of the time" because of

pain, *id.* at 9–10, and why he rejected John's allegations that his pain and other symptoms were

so severe and/or so continuous that they prevented him from working within those parameters,

*see id.* at 10–11. Finally, he challenges ALJ Hauser's decision to reject a treating physician's

opinion that John "should not lift over 20 pounds," despite purportedly finding that this opinion

was "not restrictive enough" to accommodate the limitations attributable to John's severe right

shoulder impairment. *See id.* at 10–12 (citing R. 20, 364–66). These arguments are persuasive.

Indeed, each identifies a clear legal error independently warranting reversal and remand under

the fourth sentence of 42 U.S.C. § 405(g).

*A.     Summary*

5

In December 2016, John presented to the Centra Southside Community Hospital ("Centra") after sustaining injuries in a serious car accident. R. 298. He reported experiencing severe right shoulder pain and tenderness that radiated to his chest, *id.*, and on exam he displayed right shoulder pain and tenderness with full strength but diminished range of motion, R. 299. A few days later, John told Kimberly Jubb, NP, that he "cannot lift a gallon of milk" using his right arm "without significant pain in his shoulder." R. 392. On exam, the right shoulder was "painful to palpation at [the] insertion point of [the] biceps tendon" and he had "pain extend[ing] all around to [the] axilla when he raise[d] his right arm." R. 393. NP Jubb told John to take extra ibuprofen for pain and referred him to an orthopedist for further evaluation. *Id.*

In January 2017, an MRI revealed "[d]egenerative changes to the AC joint and glenohumeral joint" and unspecified "[t]endinosis of the supraspinatus and infraspinatus tendons with suggestion of some minimal partial tearing," but no evidence of a full-thickness rotator cuff tendon tear, fracture, or focal bony lesion. R. 292. In March, John saw orthopedic surgeon Joseph Wombwell, M.D., for a reevaluation of his right shoulder. R. 351. He reported continued pain since his car accident, reported slight improvement from physical therapy, said he still had "difficulty with sustained overhead motion," and "noticed a new symptom of numbness in the bilateral hands with driving and also at night for the past couple months." *Id.* Examination of John's right shoulder revealed the following findings: no tenderness over the AC joint, forward flexion up to 150 degrees, minus ten degrees of each external and internal rotation, some pain with resisted abduction, pain with O'Brien's testing, "good" strength and normal sensation, and "near full" range of motion of the cervical spine with "some discomfort" on extension. *Id.* He also had signs of carpal tunnel syndrome ("CTS") on the right. Dr. Wombwell diagnosed impingement syndrome of the right shoulder and CTS in the right wrist. R. 352. When John

declined an injection for his shoulder, Dr. Wombwell instructed him to continue physical

therapy. At an April follow-up visit, John's right shoulder exam revealed full forward flexion

with some pain, full external rotation, minus ten degrees internal rotation, "mild pain with

resisted abduction," and pain with O'Brien's testing. R. 353. He also had some pain with neck

extension, but it did "not provoke pain to his shoulder." *Id.* Dr. Wombwell assessed right

shoulder impingement pain and partial thickness tear and possible bilateral CTS. *Id.* John again

declined an injection for his shoulder and said that "he want[ed] to return to full work." R. 354.

Dr. Wombwell gave him a work-release note. *Id.*

     In May 2017, John visited with Luke Dubois, PA-C, complaining of increased pain in

both shoulders that was more prevalent on the right. R. 356. John reaggravated his right shoulder

injury shortly after he returned to work. *See id.* ("He return[ed] to work and was required [to] lift

between 75 and 100 lb repeatedly. He noted a pop in his shoulder yesterday."). John complained

of pain with shoulder abduction, pulling, and lifting, noted some soreness and aching pain in his

left shoulder with lifting, and reported that he had been experiencing these symptoms since his

car accident. *Id.* Examination of his right shoulder revealed "ne[ar] full range of motion in all

planes [with] pain in the subacromial region at the extreme range of motion with external and

internal rotation," pain with resisted abduction and external rotation, and "mild" pain with

supraspinatus test. *Id.* John's left shoulder had "full range of motion in all planes," but

demonstrated "stiffness and pain at the extreme of the range of motion with external and internal

rotation." *Id.* PA Dubois noted they would schedule another MRI given that John's right

shoulder pain had "failed to improve with the passage of time, therapeutic medication[,] and

physical therapy." R. 356–57.

Imaging of John's shoulder in June 2017 showed degenerative changes of the common clavicular joint with mild undersurface spurring, "advanced" or "severe" tendinopathy of the distal supraspinatus tendon, and no definite full-thickness tear was observed. R. 367; *see also* R. 358 ("Study shows high grade partial thickness tearing."). Later in June, John told orthopedic surgeon John Prahinski, M.D., that when he returned to work a few weeks earlier he "felt a popping and tearing sensation" in his right shoulder causing "immediate and diffuse shoulder pain that ha[d] remained since that time." R. 358. The pain was "deep within the shoulder joint," and he also had "some cervical spine pain at the right side of his neck" with "bilateral numbness and tingling" in his hands at night. *Id*. Examination of John's shoulders showed forward elevation to 110 degrees on the right and to 130 degrees on the left, good strength with elevation, abduction to 140 degrees on the right and 160 degrees on the left, good strength externally with pain, and pain with abduction testing. *Id.* Dr. Prahinski believed "[t]here may be some progression of high grade partial thickness cuff tear" compared to findings on the January 2017 MRI, gave John a subacromial injection, referred him to physical therapy, and noted "he may benefit from shoulder arthroscopy and evaluation of cuff and consideration for repair of partial thickness tear" if his pain persisted. R. 359.

John saw Dr. Prahinski again in July and reported that he had received one hour of relief from injections, noted "some benefit" with another round of physical therapy, and said his activities were limited because of his pain. R. 361; *see* R. 356–57 (noting John had failed one complete round of physical therapy). Examination of the shoulders showed elevation to 110 degrees, abduction at 100 degrees on the right and 140 degrees on the left, external rotation to C4, internal rotation to L4, breakthrough weakness with elevation, and tenderness in the anterior shoulder. R. 361. Dr. Prahinski noted that John presented a "confusing picture" from an

orthopedic standpoint given that he had "minimal response" to the injections and only "some improvement to physical therapy" with "persistent pain and some breakthrough weakness in the shoulder." R. 362 (spelling corrected). "Shoulder arthroscopy [could] be an option[,] but [it was] hard to predict whether this will help or not." *Id.* He gave John a note restricting him to work "below shoulder level" and "no lifting over 10 pounds." *Id.* In August, John told Dr. Prahinski his shoulder pain was a "9–9.5 out of 10," and he reported some improvement from physical therapy, but said he was limited in the home exercises he could do. R. 363. Examination of the right shoulder revealed active forward flexion to 150 degrees, active abduction to 90 degrees, pain with resisted elevation and abduction, and good strength and internal and external rotation. *Id.* John and Dr. Prahinski discussed rotator-cuff surgery, but they decided "for now" to continue with "conservative management," including ultrasound-guided injections and twice-weekly physical therapy to improve shoulder range of motion and strengthening. R. 364. Dr. Prahinski also instructed John to "[c]ontinue light duty work with no lifting over 20 lbs and no overhead work" with the right arm. *Id.*; *see* R. 34 ("[T]he doctor told me don't lift over 20 pounds with my right arm"); R. 407 ("Was given a 20 pound limit on the arm.").

In September 2017, John reported that his worker's compensation insurance would not pay for the ultrasound-guided injections. *See* R. 365. John was in a "significant amount of pain," and he reported "difficulty with picking things up and holding them." *Id.* He was doing home physical therapy exercises, but he was still "limited in his activities." *Id.* ("He is unable to fish and he is unable to turn a wrench."); *see also* R. 245 ("Hard to fish or do activities."). Examination of his right shoulder demonstrated tenderness to palpation of the anterior aspect, active elevation and active abduction to 90 degrees, external rotation to the back of the head, internal rotation to the right buttock, and "no marked sensory loss." R. 365. Dr. Prahinski noted

9

that physical therapy and injections had "not provided benefit," and he was "concerned that [John] may not benefit from rotator cuff repair and debridement." R. 366. He referred John to a specialist at UVA for a second opinion. *Id.*

In June 2018, John visited with Stephen Brockmeier, M.D., at UVA for an evaluation of his "right shoulder pain and dysfunction" that had been present since December 2016. *See* R. 372–74. The pain was in his anterior shoulder and was "exacerbated by overhead movement and lifting." *Id.* Examination revealed tenderness in the right AC joint, active forward elevation to 150 degrees and passive forward elevation to 180 degrees, slightly decreased strength (4/5) of the right supraspinatus tendon, positive Hawkins test on the right, grossly intact motor function in both upper extremities, and sensation intact to light touch. R. 373–74. Dr. Brockmeier recommended surgical repair for his severe tendinopathy of the right supraspinatus tendon. R. 374. John was "amenable" to surgery, but he wanted to hold off because he did not have insurance. *Id.* An X-ray of John's shoulder taken that day displayed "[m]oderate AC joint degenerative change." R. 376. John saw Dr. Brockmeier again in November, reporting that his right shoulder pain persisted. R. 371. On exam, he had a Popeye's deformity on the right, positive Hawkins and O'Brien's tests on the right, and slightly decreased (4/5) strength of the right infraspinatus tendon, as well as forward elevation to 170 degrees bilaterally. *Id.* Dr. Brockmeier again noted that John was amenable to surgery, but that he wished to get his finances in order before scheduling it. R. 372.

In March 2019, John saw Joseph Davis, F.N.P., complaining of right arm pain, shoulder pain, and swelling in his hands. R. 397. "He continue[d] to have chronic pain in the right upper extremity with muscle tone loss, decreased ROM and weakness[.] In the past year, he [also] had more pain on the left shoulder." *Id.* On exam, his right shoulder appeared atrophied, his biceps

tendon had "a proximal rupture with atrophy and decreased strength," his range of motion in the right shoulder was "relatively normal," but he had pain with active range of motion on the right. R. 398. His "left shoulder appear[ed] normal, but he ha[d] marked ROM due to pain." *Id.* FNP Davis prescribed Diclofenac for pain and referred John back to Dr. Prahinski for further orthopedic evaluation. *Id.* FNP Davis's examination findings were unchanged in April. R. 402.

In July 2019, John saw Steven Hansen, D.O., for a consultative physical exam. *See* R. 407–11. He reported chronic shoulder pain since his car accident nearly three years earlier that had not responded to physical therapy or injections. R. 407. He felt like he dropped "a lot of things" and did "not have the strength that he did previously." *Id.*; R. 408 (reporting joint pain, joint swelling, joint stiffness, weakness, numbness, and tingling); *see also* R. 247 ("Arm always in pain, no strength, no grasp, goes numb, hand and fingers go numb"). John took longer to feed, bathe, and dress himself, and he needed "some help putting socks on." R. 407; *see also* R. 241–42. His wife did the cleaning; he did his laundry and "some" dishes. *Id.*; *see* R. 242. John reported that he could "stand for maybe 30 minutes" and he needed "to lean on a cart at [the] grocery store." *Id.* Dr. Hansen observed that John did not need help getting off the exam table during his evaluation, but he did need "some assistance" taking his shoes on and off. R. 408 ("Good effort. No inconsistencies."). On exam, John had tenderness to palpation of both shoulders; tenderness to palpation of the bilateral lumbar spine with mild paraspinal musculature hypertrophy; positive empty-can, Neers, Hawkins, and cross-arm abduction tests bilaterally; normal but painful active and passive range of motion in the shoulders, elbows, writs, and hands; slightly decreased (4/5) strength in the bilateral deltoid and bicep muscles secondary to pain, and intact sensation to light touch except in the right ulnar distribution. *See* R. 409–10. Dr. Hansen noted John's symptoms were "chronic and credible" and, "with the failure of conservative

11

treatment, [he] may be at [the] point of surgical evaluation, which could alleviate [his] pain long

term." R. 410. Dr. Hansen opined that John had "some functional deficits" based on his exam

findings that day. John could be expected to stand and walk for "about 4–6 hours" each and sit

without restriction during an eight-hour workday; lift and carry "25 lbs occasionally and 15 lbs

frequently"; only "rarely" reach, handle, feel, grasp, and finger; and never do any "overhead

reaching." R. 410–11.

DDS consultant Bert Spetzler, M.D., reviewed John's medical records in August 2019.

*See generally* R. 55–67, 71–83. Dr. Spetzler opined that John's upper-extremity disorders and

their related symptoms—including AC joint arthritis, right bicep tendonitis and rupture,

impingement syndrome of the right shoulder, torn right rotator cuff, right upper-extremity pain,

chronic bilateral shoulder pain, and nonsevere CTS in the right wrist—would restrict John's

exertional and manipulative capacities in the workplace. *See* R. 65–67, 81–83. Specifically, John

could lift and/or carry 25 pounds both "frequently" and "occasionally"[5]; could sit and stand

and/or walk for "about 6 hours" each in an eight-hour workday; could frequently use his right

upper extremity to push and/or pull, handle objects, and reach in front and/or to the side; and

could frequently reach overhead with his left arm, but only occasionally reach overhead with his

right arm. *See id.* Dr. Spetzler noted that his proposed RFC was "consistent with [Dr. Hansen's]

"recommendations and physical examination" from July 2019. R. 67, 83. *But see* R. 410–11

(imposing greater exertional and manipulative limitations). DDS consultant Jack Hutcheson,

M.D., identified the same functional limitations after reviewing John's medical records in

January 2020. *See* R. 101–05, 119–23. Unlike Dr. Spetzler, however, Dr. Hutcheson noted that

---

[5] "'Frequent' [or 'frequently'] means occurring from one-third to two-thirds of the time," or about six
hours during an eight-hour workday." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). "'Occasionally'
[or 'occasional'] means occurring from very little up to one-third of the time" and "should generally total
no more than about 2 hours of an 8-hour workday." *Id.* at *5.

Dr. Hansen's RFC "contain[ed] inconsistencies," lacked "substantial support" in his consultative

report, and "overestimate[d] the severity of [John's] restrictions/limitations." R. 105, 124.

At the administrative hearing in August 2020, John testified that he stopped working

when he reinjured his right shoulder. R. 32. That arm still gave him "a hard time" with pain,

weakness, and numbness. R. 34; *see* R. 32–34, 38–39. His doctor told him not to "lift over 20

pounds with [the] right arm," and he tried to heed those instructions because he would "be laid

up for a couple days" if he tried to do more. R. 34. John had trouble lifting his right arm above

his head, but he could reach overhead with his left arm. *Id.* He "never had the opportunity to

have surgery" on his shoulder because he did not have insurance. R. 33.

After John finished testifying, ALJ Hauser asked the VE to identify occupations that a

hypothetical "person of advanced age" who had a "limited education" and "skilled" work history

with "transferable skills," R. 44–45, could perform if the person had this RFC:

> He can lift 25 pounds frequently, 25 pounds occasionally, and that is with his *right* arm. With his *left* dominant arm, he can lift 15 pounds frequently and 25 pounds occasionally. He can *sit* six out of eight hours. He can *stand* six out of eight hours. He will require a ten-minute break every two hours. No negotiation of ladders, ropes and scaffolds, but crawl, crouch, bend, stoop, kneel, climb steps and ramps occasionally. No overhead with the -- with the left arm -- or *no overhead with the right arm*, and he is left-arm dominant. Range of motion with the right arm shoulder high with the lateral and straight range of motion. Continuous fine and gross dexterity. Off task 7% of the time, *and that's nine days* of work a year.

R. 45 (emphasis added). *But see* R. 16 (ALJ finding that John could perform "light work" as

defined in the regulations, except he was "limited to lifting and/or carrying 25 pounds frequently

with the *left* dominant upper extremity and 15 pounds occasionally and 25 pounds frequently

with the *right* upper extremity and *walking*, standing, *and* sitting for six hours in an eight-hour

workday"; must be able to take a ten-minute break every two hours; could occasionally engage

in most postural activities, but never climb ladders, ropes, or scaffolds; "never *reach overhead*

13

with the right upper extremity"; was "limited to lifting his right arm to shoulder height with

lateral and straight range of motion"; and because of pain, "must be able to be off-task 7% of the

time *and* miss nine days of work a year" (emphasis added)). In his testimony, the VE indicated

that he interpreted ALJ Hauser's limitation for "no overhead with the right arm," R. 45, to mean

"no *lifting* overhead with the right … arm," R. 47 (emphasis added). *But see* R. 16 ("He can

never *reach* overhead with the right upper extremity" (emphasis added)). The VE testified that a

person with John's vocational profile and the RFC quoted above could do only one "light"

occupation—Comparator Operator—that offered jobs in the national economy. R. 46 (ALJ: "So

just that one job, 24,000?" VE: "Yes."). A comparator operator's work involves "viewing a

machine that projects magnified shadows on [a] screen" and "inspecting parts for defects."[6] R.

49 (citing DOT No. 699.385-010); *see also* R. 50–51 (VE's testimony that this occupation's job

description was last updated in 1977, but that the occupation "still exists" in 2020, and that it

provides 24,000 jobs nationally). In order to transition to this "semiskilled" occupation, however,

the person needed transferable "skills in machine repair, . . . use of hand tools, automotive repair,

machine repair, parts inspection," R. 46, or "being able to diagnose mechanical problems" in

automobiles and machines," R. 48. The VE indicated that the repair skills John acquired in his

---

[6] Comparator Operator or Shadowgraph Operator: "Inspects parts for defects in finish and dimensions, using machine that projects magnified shadows of parts on screen: Reads specifications of part to ascertain form and degree to be magnified. Draws enlarged outline of part to scale on chart (celluloid disk), using scribers, dividers, and straightedge. Places chart over translucent glass disk of comparator (shadowgraph) machine. Inserts specified lens into machine and adjusts mirrors to magnify parts. Positions and secures parts on machine table. Turns light on and moves levers of machine to bring shadows of parts into focus with chart outline. Inspects shadows for imperfections of finish and incorrect dimensions. Prepares reports of findings. May rotate part in holding fixture to examine surfaces and to verify concentricity of parts." *Dictionary of Occupational Titles* No. 699.384-010 (4th ed. 1991), *available at* 1991 WL 678851. This occupation requires "exerting up to 20 pounds of force occasionally . . . and/or up to 10 pounds of force frequently . . . and/or a negligible amount of force constantly . . . to move objects," and it may require either "walking or standing to a significant degree . . . sitting most of the time" while pushing/and or pulling arm or leg controls, or "working at a production rate pace [with] . . . constant pushing and/or pulling materials even though the weight of those materials is negligible." *Id.* It also requires "frequent" reaching and "significant" fine and gross manipulation. *Id.*

14

past "skilled" work as a mechanic were transferable to Comparator Operator positions because "somebody who is repairing automobiles or machinery would have to inspect parts" for defects. R. 48–49. The VE also testified that this occupation requires "frequent reaching, but in [his] opinion, it's not overhead." R. 50; *see* R. 49 (VE: "As far as the reaching, handling, and fingering, that's all frequent."). There is "no overhead lifting required." R. 47.

*

ALJ Hauser discussed much of this evidence in his written decision. *See* R. 16–21. At step two, he found that John's degenerative joint disease of the right AC joint with right shoulder tendinopathy and obesity were "severe" impairments because they "significantly limit[ed] the ability to perform basic work activities," R. 15, which according to the regulations include physical functions like "lifting, pushing, pulling, reaching, carrying, or handling," 20 C.F.R. §§ 404.1522(b)(1), 416.922(b)(1). John's diagnosed CTS was "not severe" because it was "well controlled with medication and appropriate treatment" and "present[ed] no evidence of residual abnormalities that ha[d] more than a minimal effect on [his] ability to perform basic work activities on a regular and continuing basis." R. 15. ALJ Hauser then summarized John's subjective statements and testimony, his treatment history, many relevant findings on physical exams and diagnostic images, Dr. Hansen's RFC assessment, Dr. Prahinski's opinion restricting John to "no overhead work or lifting over 20 pounds," and aspects of the DDS physicians' RFC assessments. *See* R. 16–20.

As part of his RFC analysis, ALJ Hauser found that "[w]hile the record support[ed] some limitations that [John] ha[d] alleged due to right shoulder and arm pain, weakness, and numbness, the record d[id] not support the severity of limitations alleged." R. 20. For example, John "received conservative treatment for his impairments[,] including pain medications,

injections, and physical therapy," and John "reported some improvement with [this] treatment." *Id.* Providers' treatment notes "generally described" John as having "grossly intact sensation, grossly intact motor exam, generally full range of motion in the right shoulder, and full range of motion in the head and neck." *Id. But see* R. 17–19 (summarizing mixed normal and abnormal findings on musculoskeletal exams). John also "reported that he was generally able to manage his personal care" and other daily activities, and he "continued to do automotive and repair work for a few hours a month through 2019." R. 20. *But see* R. 31 ("Q: . . . I see some earnings in 2019. How did you make that money? A: . . . I turn a wrench every now and then."). Thus, the "record [did] not support the severity of limitations as alleged." R. 20.

Finally, ALJ Hauser found that Dr. Hansen's and Dr. Prahinski's medical opinions were "not persuasive" because they were "not entirely consistent with the record" and "not entirely supported by" each physician's own exam findings. R. 20–21 (explaining that Dr. Hansen's opinion "overstates [John's] manipulative limitations" and "fails to account for additional off-task, absenteeism, break limitations," and that Dr. Prahinski's opinion "does not account for limitations to light work with additional exertional, postural, right extremity reaching and range of motion, break, off-task, and absentee limitations due to right shoulder and arm pain, weakness, and numbness"). The DDS physicians' opinions that John could do "medium work with additional exertional, postural, and manipulative limitations due to right upper extremity pain and weakness" were "not persuasive because they [were] not entirely supported by [each physician's] summaries of the evidence and not entirely consistent with the record." R. 19. Rather, ALJ Hauser concluded that the "record support[ed]" further restricting John to "lifting and/or carrying 15 pounds occasionally and 25 pounds frequently with the right, non-dominant upper extremity in addition to a ten-minute break every two hours, off-task 7% of the time, and

missing nine days of work a year due to right shoulder and arm pain, weakness, and numbness."
*Id.* After analyzing each opinion, ALJ Hauser noted that John "demonstrated tenderness, pain,
reduced 4/5 strength, and some range of motion limitations in the right shoulder and arm" on
physical exams, "but he was generally well-appearing . . . with grossly intact sensory and motor
examinations, normal grips, normal gait and station, and he did not require an assistive device to
ambulate." R. 19–20 (citing R. 299, 373, 387, 398, 408–10, 417).

Ultimately, ALJ Hauser concluded (as most relevant here) that John retained the RFC to
do "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), "except [he] is limited to
lifting and/or carrying 25 pounds frequently with the left dominant upper extremity and 15
pounds occasionally and 25 pounds frequently with the right upper extremity and walking,
standing, and sitting for six hours in an eight-hour workday"; he can "never reach overhead with
the right upper extremity and he is limited to lifting his right arm to shoulder height with lateral
and straight range of motion"; and due to pain, he "must be able to be off-task 7% of the time
and miss nine days of work a year." R. 16. This RFC's exertional limitations ruled out John
returning to his past relevant work as an auto mechanic and maintenance mechanic/machine
repair worker. *See* R. 21 (citing R. 44–45). Both occupations involved "skilled" work and
"required the following skills: use of hand tools, automotive repair, machine repair, [and] parts
inspections." *Id.* (citing R. 44–46, 48). At step five, ALJ Hauser stated that he had "asked [the
VE] if any occupations exist which could be performed by an individual with the same age,
education, past relevant work experience, and residual functional capacity as [John], and which
require skills acquired in [his] past relevant work but no additional skills." R. 22. *But see* R. 45–
47 (hypothetical RFC setting out materially different or ambiguous exertional, manipulative, off-
task, and absenteeism restrictions). In response, the VE purportedly testified that this person

could work as a Comparator Operator, which is a semiskilled occupation performed "at the light

exertional level" and offering about 24,000 jobs nationally. R. 22. The ALJ accepted the VE's

testimony in concluding that John was not disabled, R. 21–22, because "the former [mechanic]

could successfully transition to less physically demanding work . . . . exist[ing] in significant

numbers in the national economy,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (Apr. 1, 2019)

(quoting 20 C.F.R. § 404.1560(c)(1)).

B.     *Analysis*

       John challenges ALJ Hauser's denial of benefits on three grounds. First, he argues that

ALJ Hauser erred by finding that he could work as a Comparator Operator and, as such, the

Commissioner did not carry her evidentiary burden to show John was "not disabled" at step five.

*See* Pl.'s Br. 1, 6–9 (discussing transferability of skills). Second, he argues that ALJ Hauser

failed to explain how he concluded John would be "off-task 7% of the time" because of his pain,

*id.* at 9–10, and why he rejected John's allegations that his shoulder pain caused more significant

work-related functional limitations. *Id.* at 10–11. Third, he challenges ALJ Hauser's decision to

reject Dr. Prahinski's opinion that John "should not lift over 20 pounds," despite purportedly

finding that this opinion was "not restrictive enough" to accommodate other limitations

attributable to John's shoulder impairment. *Id.* at 10–12 (citing R. 20, 364–66). Each argument

identifies a clear legal error independently warranting reversal and remand under the fourth

sentence of 42 U.S.C. § 405(g).

       1.     *RFC Assessment*

       John's second and third objections relate to ALJ Hauser's RFC assessment. A claimant's

RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary

work setting" for eight hours a day, five days a week despite his or her medical impairments and

related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The

Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC."

*Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a

function-by-function assessment based upon all of the relevant evidence of [the claimant's]

ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify

each impairment-related functional restriction that is supported by the record, *Monroe v. Colvin*,

826 F.3d 176, 179 (4th Cir. 2016). *See* SSR 96-8p, 1996 WL 374184, at *1, *5 (explaining that

an ALJ determining the claimant's exertional RFC must identify the claimant's impairment-

related "functional limitations or restrictions" and evaluate his or her "work-related abilities on a

function-by-function basis," e.g., sitting, standing/walking, lifting/carrying, before the ALJ can

express the RFC "in terms of the exertional levels of work, [i.e.,] sedentary, light, medium,

heavy, and very heavy"). The RFC should reflect credibly established "restrictions caused by

medical impairments and their related symptoms," including pain, that impact the claimant's

"capacity to do work-related physical and mental activities" on a regular and continuing basis,

SSR 96-8p, 1996 WL 374184, at *1, *2. Second, the ALJ's decision must include a "narrative

discussion describing" how specific medical facts and non-medical evidence "support[] each

conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically

explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those

conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC

findings when he or she considered all relevant evidence under the correct legal standards, *see*

*Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written

decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s],"

*Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12.

Conversely, a reviewing court that "cannot gauge the propriety of the ALJ's RFC assessment

[generally] cannot say that substantial evidence supports the [Commissioner's] denial of

benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017)

"Symptoms," or the claimant's own description of his or her medical impairment(s), 20

C.F.R. §§ 404.1502(i), 416.902(n), play a crucial role in a proper RFC determination, *Mascio*,

780 F.3d at 639–40. The regulations set out a mandatory two-step process for evaluating

symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for

objective medical evidence showing a condition that could reasonably produce the alleged

symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig

v. Chater*, 76 F.3d 585, 594, 596 (4th Cir. 1996) (ALJ's failure to "expressly consider" threshold

question of whether claimant "demonstrated by objective medical evidence an impairment

[reasonably] capable of causing the degree and type of pain she alleges" was reversible legal

error). Second, assuming the claimant clears step one, "the ALJ must evaluate the intensity,

persistence, and limiting effects of the claimant's symptoms to determine the extent to which

they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing

basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565. "The second [step] requires the ALJ to

assess the credibility of the claimant's statements about symptoms and their functional effects,"

*Lewis*, 858 F.3d at 866, after considering all relevant evidence in the record, 20 C.F.R. §§

404.1529(c), 416.929(c). The ALJ must give specific reasons, supported by "references to the

evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1,

2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2,

*4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility finding if his or her

articulated rationale is legally adequate and supported by substantial evidence in the record. *See*

*Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

ALJ Hauser's RFC assessment does not meet these deferential standards of review. First, he did not explain how he found that John "must be able to be off-task 7% of the time and miss nine days of work a year," to accommodate his pain, R. 16, and he did not cite any evidence in the record to support those figures. *See Woods*, 888 F.3d at 694 ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his conclusion."); *Richardson v. Saul*, No. 4:19cv128, 2020 WL 3816317, at *5–7 (E.D.N.C. June 9, 2020) (reversing and remanding where ALJ found claimant would be "off task up to nine percent of the workday" because of "pain and medication side-effects," but failed to explain "where the nine-percent figure came [from] and why this limitation adequately account[ed] for [her] limitations"). His conclusory assertion that "the record supports" his chosen off-task and attendance limitations, R. 19–20, is not sufficient. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence."). Additionally, because ALJ Hauser did not specify what he meant by "off-task 7% *of the time*," R. 16 (emphasis added), it is not clear whether that restriction allows John to be off task 7% of an eight-hour workday, either including or excluding normal breaks; 7% of a five-day workweek; or 7% of workdays per 52-week year. *Cf. Thomas*, 916 F.3d at 312 ("[W]hile the ALJ stated that Thomas could not perform work 'requiring a production rate or demand pace,' she did not give us enough information to understand what those terms mean. That makes it difficult, if not impossible, for us to assess whether their

inclusion in Thomas's RFC is supported by substantial evidence."). The ALJ's hypothetical question to the VE suggests that he meant 7% of workdays every year, which he defined as "nine days a year." R. 45 ("Off task 7% of the time, *and that's* nine days of work a year." (emphasis added)). His RFC finding, on the other hand, explicitly allows John to be off task 7% of the time *in addition to* missing nine workdays a year. R. 16 ("Due to pain, the claimant must be able to be off-task 7% of the time *and* miss nine days of work a year." (emphasis added)). In short, the ALJ's written decision does not provide "enough information to understand" what his off-task and attendance limitations mean, *Thomas*, 916 F.3d at 312, and how he chose those specific figures, *Richardson*, 2020 WL 3816317, at *6. "That makes it difficult, if not impossible," for the Court to determine "whether their inclusion in [John's] RFC is supported by substantial evidence" in the record. *Thomas*, 916 F.3d at 312.

Second, ALJ Houser's statement that he included off-task and attendance limitations in John's RFC to accommodate his "pain," R. 16, suggests that he "chose to credit some, but not all, of [John's] statements" describing his pain-related limitations, *Mascio*, 780 F.3d at 640. *See* Pl.'s Br. 9–10. John often reported that chronic upper-extremity pain, weakness, and numbness seriously limited his ability to complete daily activities on a regular and continuing basis. *See, e.g.*, R. 32–34, 38–39, 241–42, 245, 247, 351, 356, 363, 365, 372–74, 392, 397, 407–08. ALJ Houser found that the "record support[ed] some of the limitations that [John] alleged due to right shoulder and arm pain, weakness, and numbness," but that "the record [did] not support the severity of limitations alleged." R. 20. He gave three reasons to support that finding, one of which was that John had "reported that he was generally able to manage his personal care and hygiene, prepare meals, use a riding mower to cut the grass, perform light house cleaning, drive, shop for groceries, and spend time with his grandchildren." *Id.* But he did not acknowledge

John's testimony that he did these activities on his own time and at his own pace, and he did not

explain how John's ability to do such basic activities *on that basis* undermined John's allegations

that chronic pain would not allow him to do paid work eight-hours a day, five days a week.

*Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform

without also considering the *extent* to which [he or] she can perform them."); *Kimberly S. v.*

*Saul*, No. 4:20cv4, 2021 WL 649800, at *7 (W.D. Va. Feb. 18, 2021) ("Viewed in context, there

is nothing inherently inconsistent between Kimberly's description of her daily activities, which

she can perform on her own time at her own pace, and her allegation that she cannot do a paying

job for eight hours a day, five days a week."). He also found that John had "received

conservative treatment for his impairments including pain medications, injections, and physical

therapy," R. 20, without considering uncontradicted evidence that John could not afford the

shoulder surgery that his physicians recommended, R. 33, 374. *See Lovejoy v. Heckler*, 790 F.2d

1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment [he

or] she cannot afford[.]"); SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017) (requiring ALJs

to consider evidence that the claimant "may not be able to afford treatment and may not have

access to free or low-cost medical service" when assessing severity of pain and other symptoms).

More problematic still, ALJ Hauser did not "expressly consider the threshold question of

whether [John] had demonstrated by objective medical evidence," *Craig*, 76 F.3d at 596, "the

existence of medical impairment which could *reasonably be expected* to produce the actual pain,

in the amount and degree," that John alleged in connection with his disability claim, *id.* at 594

(emphasis added); R. 20 ("While the record supports some limitations that the claimant has

alleged due to right shoulder and arm pain, weakness, and numbness, it does not support their

severity."). *Cf. Danielle B. v. Saul*, No. 4:20cv27, 2021 WL 2845317, at *8–9 (W.D. Va. July 8,

2021) (ALJ's finding that "[w]hile the record supports the types of limitations that the claimant has alleged, it does not support their severity" did not constitute express threshold finding required by regulations). "Instead, the ALJ proceeded directly to considering the credibility of those allegations," *Craig*, 76 F.3d at 594, stating various reasons why "the record [did] not support the severity of limitations alleged," R. 20. *See Danielle B.*, 2021 WL 2845317, at *8–9. This is reversible legal error, *see Craig*, 76 F.3d at 595, that requires remand "so that the Commissioner can conduct [the] proper two-step analysis of [John's] alleged symptoms and limitations," *Danielle B.*, 2021 WL 2845317, at *9 (collecting cases holding the same).

Third, ALJ Hauser did not explain why he implicitly accepted Dr. Prahinski's opinion that John should not do any "overhead work" with his right arm, R. 16, 20, but explicitly rejected his opinion that John also should not lift "over 20 pounds," R. 20 (citing R. 364–65); *see* R. 16, 19, 20 (finding John could lift/carry "25 pounds frequently" with the right arm). *Michael B. v. Saul*, No. 7:19cv751, 2020 WL 7497803, at *7 (W.D. Va. Dec. 21, 2020) ("While an ALJ is under no obligation to accept any medical opinion, . . . . '[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted.'" (quoting SSR 96-8p, 1996 WL 374184, at *7)); *cf. Warren v. Astrue*, No. 2:08cv3, 2008 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision.").

Finally, although John did not raise this error, it is worth noting that ALJ Hauser's RFC determination is internally inconsistent and ambiguous. For example, if John can only use his right arm to lift/carry up to "15 pounds occasionally," then he cannot also use that arm to lift/carry "25 pounds frequently." R. 16, 19. The terms "frequent" and "occasional" are mutually

exclusive vocational descriptors—"frequent" means "occurring from one-third or two-thirds of the time," or about 6 hours of during an 8-hour workday, whereas "occasional" means "occurring from very little up to one-third of the time," and "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5–6. Understood within the proper regulatory framework, ALJ Hauser's RFC restricts John to lifting/carrying at most 15 pounds with his right arm for about two hours during the workday. He cannot lift/carry any greater amount of weight with that arm, and he cannot spend more than two hours of his workday lifting or carrying 0 to 15 pounds. *See Tina H. v. Saul*, No. 7:19cv172, 2020 WL 5526498, at *4 (W.D. Va. July 20, 2020) ("'RFC is not the *least* an individual can do despite his or her limitations or restrictions'—it is the *most* a person can do on a sustained basis for eight hours a day, five days a week." (quoting SSR 96-8p, 1996 WL 374184, at *2)). Conversely, John can use his left arm to lift/carry up to 25 pounds for about 6 hours during the workday. *See* R. 16 (finding that John could lift and/or carry "25 pounds frequently" with the left dominant arm). The RFC determination is ambiguous because, although it restricts John to "never reach[ing] overhead with the right upper extremity," it does not quantify his maximum remaining ability to reach or "lift[] his right arm to shoulder height with lateral and straight range of motion," R. 16, on a regular and continuing basis. *Cf. Tina H.*, 2020 WL 5526498, at *4 (recommending reversal and remand because the ALJ "never discussed Tina's '*maximum* remaining ability' to lift, carry, sit, stand, or walk on a sustained basis" (quoting SSR 96-8p, 1996 WL 374184, at *2)). The DDS physicians opined that John should only "frequently" use his right upper extremity for handling, pushing, pulling, and "front and/or lateral" reaching, R. 65–67, 81–83, 101–02, 120–21, which is more restrictive than the ALJ's RFC finding, R. 16. Again, ALJ Hauser did not explain why he rejected those proposed manipulative limitations, despite agreeing with the DDS physicians that

John's "right upper extremity pain and weakness" caused work-related functional limitations. R. 19 (ALJ citing DDS opinions that John could frequently lift and/or carry 25 pounds and had "manipulative limitations due to right upper extremity pain and weakness," but finding that "the record support[ed] additional limitations including lifting and/or carrying 15 pounds occasionally and 25 pounds frequently with the right, non-dominant upper extremity . . . due to right shoulder and arm pain, weakness, and numbness"). Each error requires reversal and remand for a proper RFC assessment.

### 2.      *Step Five – The VE's Testimony*

John also argues that ALJ Hauser erred in finding he could transition to work as a Comparator Operator and, as such, the Commissioner did not carry her evidentiary burden to show John was "not disabled" at step five. *See* Pl.'s Br. 1, 6–9. His argument focuses on the ALJ's finding that John had the "transferable skills" to do this work, which is material to whether John would be entitled to disability benefits under "the Grids" if he retained the RFC to do a full range of light work. *Compare id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.02 (directing a finding of "disabled" for a person of "advanced age" who can do a full range of light work and has a "limited" education and "skilled or semiskilled" work experience if the past work skills are "not transferable")), *with* R. 22 (finding that John's "additional limitations do not allow [him] to perform the full range of light work," but that a finding of "not disabled [was] appropriate under" Grid Rule § 202.03) (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.03 (directing a finding of "not disabled" for a person with the same RFC and vocational profile where the past work "skills [are] transferable"))). John also challenges ALJ Hauser's statement that he asked the VE about job prospects for someone with John's RFC, vocational profile, and the "skills [he] acquired in [his] past relevant work *but no additional skills*," noting that the ALJ

did not say anything about "additional skills." *Id.* at 9 (emphasis added) (citing R. 22). His

second point is correct, *see* R. 45–51, and it reveals an even more serious legal error: the RFC in

ALJ Hauser's hypothetical question to the VE, R. 45–47, does not "adequately reflect," *Johnson*,

434 F.3d at 659, the RFC finding in ALJ Hauser's written decision, R. 16. *Fisher v. Barnhart*,

181 F. App'x 359, 364 (4th Cir. 2006) ("[A] hypothetical question is unimpeachable if it

'*adequately reflect[s]*' a residual functional capacity for which the ALJ had sufficient evidence."

(quoting *Johnson*, 434 F.3d at 659)). Thus, even if the Court upheld the ALJ's otherwise flawed

RFC finding, R. 16, the existing administrative record contains no evidence to support a

conclusion that a person with *that* RFC and John's vocational profile could work as a

Comparator Operator because the VE was never asked a question incorporating all of those RFC

limitations. *Cf. Morgan v. Barnhart*, 142 F. App'x 716, 720–21 (4th Cir. 2005) (reversing and

remanding where ALJ's exertional RFC finding was more restrictive than the limitations in

operative hypothetical to VE); *Daniel U. v. Saul*, No. DLB-19-2889, 2021 WL 1224066, at *2–3

(D. Md. Mar. 31, 2021) (reversing and remanding where ALJ asked VE about "simple, routine

and repetitive tasks, . . . not [performed] at a production-rate pace," but operative hypothetical

question omitted ALJ's subsequent RFC finding that the phrase "production rate pace" included

"assembly line work"); *Angela S. v. Saul*, No. TJS-19-2849, 2021 WL 733373, at *3–4 (D. Md.

Feb. 25, 2021) (same).

Where, as here, the claimant carries his or her burden to show that his or her severe

medical impairment(s) rule out returning to his or her past relevant work, the burden shifts to the

Commissioner at Step 5 to demonstrate that the impairment(s) "does not prevent the claimant

from engaging in other substantial gainful employment." *Patterson*, 846 F.3d at 659–60 (citing

20 C.F.R. §§ 404.1512(f), 404.1520(g)(1)). To do this, the Commissioner, acting through the

ALJ, "must present evidence that demonstrates that other work exists in significant numbers in

the national economy that the claimant can do, given [his or] her residual functional capacity and

vocational factors." *Id.* (quoting 20 C.F.R. § 404.1560(c)(2)) (cleaned up). Here, ALJ Hauser

tried to meet that burden by asking a VE "to address complex aspects of the employment

determination, including the [VE's] observations of what a particular [occupation or] job

requires in practice or the availability of given positions in the national economy." *Pearson v.

Colvin*, 810 F.3d 204, 207 (4th Cir. 2015). For the VE's testimony to reasonably support the

ALJ's denial of benefits, however, "it must be in response to hypothetical questions which fairly

set out all of the claimant's" work-related "abilities and limitations." *Walker v. Bowen*, 889 F.2d

47, 50 (4th Cir. 1989) ("In this case the ALJ did not ask questions that ensured that the

vocational expert knew what the claimant's abilities and limitations were. Therefore, his answers

to those questions were not particularly useful."). If that evidence is not in the administrative

record, then the Court cannot uphold the denial of benefits. *See, e.g.*, *Daniel U.*, 2021 WL

1224066, at *4 (citing *Patterson*, 846 F.3d at 658) ("Where an insufficient record precludes a

determination that substantial evidence supported the ALJ's denial of benefits, this court may not

affirm for harmless error.")).

     Here, the VE was asked about the job prospects for someone with John's vocational

profile and the following (relevant) limitations:

> lift 25 pounds frequently, 25 pounds occasionally, and that is with his *right* arm.
> With his *left* dominant arm, he can lift 15 pounds frequently and 25 pounds
> occasionally. He can *sit* six out of eight hours. He can *stand* six out of eight hours.
> . . . No overhead with the -- with the left arm -- or *no overhead with the right arm*,
> and he is left-arm dominant. . . . Off task 7% of the time, *and that's nine days* of
> work a year.

R. 45 (emphasis added). The VE interpreted the phrase "no overhead with the right arm," *id.*, to

mean "no *lifting* overhead with the right arm," R. 47 (emphasis added). This was the RFC that he

used when he testified that a person could work as a Comparator Operator, which is a "semi-skilled" light occupation offering 24,000 jobs in the national economy. The VE also testified that this occupation requires "frequent reaching, but in [his] opinion, it's not overhead." R. 50; *see* R. 49 (VE: "As far as the reaching, handling, and fingering, that's all frequent."). He did not clarify whether he meant the job involves no overhead reaching at all, or whether overhead reaching is required on a less-than-frequent basis. He did clarify that "no overhead *lifting* [is] required," however. R. 47 (emphasis added).

ALJ Hauser's RFC finding, on the other hand, says that John was "limited to lifting and/or carrying 25 pounds frequently with the *left* dominant upper extremity and 15 pounds occasionally and 25 pounds frequently with the *right* upper extremity and *walking*, standing, *and* sitting for six hours in an eight-hour workday"; could "never *reach overhead* with the right upper extremity"; and "must be able to be off-task 7% of the time *and* miss nine days of work a year." R. 16 (emphasis added). The VE was never asked about the job prospects for a person with the italicized functional limitations, which are more restrictive than the hypothetical question to the extent that they limit John to no overhead "reaching," as opposed to no overhead "lifting," with the right arm and allow him to be off-task 7% of the time *in addition to* missing nine workdays every year, R. 16. *Cf. Morgan*, 142 F. App'x at 720–21 (reversing and remanding where ALJ's exertional RFC finding was more restrictive than the limitations in hypothetical to VE). Thus, "the administrative record does not clearly demonstrate that [John] can actually perform the occupation[] identified by the VE and relied on by the ALJ at the fifth step." *Keller v. Berryhill*, 754 F. App'x 193, 199 (4th Cir. 2018).

## IV. Conclusion

I take no position on whether John is entitled to disability benefits. On remand, the ALJ must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming John cannot prove disability at step three, provide an accurate, logical link between the evidence the ALJ found credible and the RFC determination. To carry her burden of proof at step five, the Commissioner must produce reliable evidence "about the availability of jobs to a hypothetical person" like John, *Dozier v. Colvin*, No. 4:14cv93, 2015 WL 3791349, at *5 (E.D.N.C. June 17, 2015), in response to a question setting out the limitations in the ALJ's RFC determination, *Morgan*, 142 F. App'x at 720–21; *Walker*, 889 F.2d at 50.

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** John's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 2, 2022

Joel C. Hoppe
United States Magistrate Judge